UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN
MILWAUKEE DIVISION

---

**WALTER V. LOVE,**

               Plaintiff,

                                       Case No.:  2:12-CV-689-NJ

v.

**J.P. CULLEN & SONS, INC.,**

               Defendant.

---

### PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT'S
### MOTION FOR SUMMARY JUDGMENT

---

Pursuant to Civil Local Rule 56(b)(2)(A) plaintiff Walter V. Love, submits the following memorandum of law in opposition to defendant's motion for summary judgment.

### INTRODUCTION

Plaintiff, Walter V. Love ("Love") has alleged the defendant J.P. Culllen & Sons, Inc., a general contractor, engaged in discriminatory conduct against the plaintiff, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. sec. 2000(e), et seq.  (ECF No.'s 1 & 17). Defendant filed its Motion for Summary Judgment and supporting materials on June 20, 2013. (ECF No.'s 21, 22, 23, 24, 25, 26).  Plaintiff now responds herein demonstrating that as a matter of law, defendant cannot show that Summary Judgment should issue.  Further, plaintiff respectfully requests that defendant's Motion for Summary Judgment be denied and dismissed in its entirety and with prejudice.

### STATEMENT OF FACTS

Plaintiff  was a member of Laborers Union Local 113 in Milwaukee, Wisconsin from at least August 31, 2008 through approximately November 2012, when he could no longer afford to

pay his union dues, due to being unemployed. (PPAF No. 2)[1]. On or about September of 2005, the City of Milwaukee undertook a large renovation project of the City Hall Building. (PPAF No. 3). Plaintiff began working on the Milwaukee City Hall Renovation Project ("Project") as employee of Union Contracting Inc., ("UCI") on or about June 2007. (PPAF No. 3). Plaintiff was hired by Union Contracting Inc., a company that employs more than 15 people, as a foreman to work on the renovation project and his duties included but were not limited to, shipping and receiving, management of laborers and masons, and making sure proper materials were on site and properly staged. (PPAF No. 4). The plaintiff often worked several stories above the street. (PPAF No. 5). Plaintiff expected that when the Project ended, he would continue to work for UCI on their next project and that his employment would be on-going with UCI. (PPAF No. 6). It was the goal of the plaintiff, as with most construction workers, to find employment with a solid contractor or subcontractor so as to maintain employment after the current project ended, thereby moving from project to project with the same employer. (PPAF No. 7).

J.P. Cullen & Sons, Inc., ("Cullen") was the general contractor on the Project. (PPAF No. 8). Scott Henninger ("Henninger") was the job superintendant at UCI. (PPAF No. 9). Henninger received work directions from Cullen, and then passed those instructions on to the plaintiff. (PPAF No. 10). Instructions included, what work was to be done, when it was to be done, where it was to be done, when it was to be completed, and at times, how it was to be completed. (PPAF No. 10). One time Cullen had the plaintiff and UCI employees tear out a section of terra cotta that was previously installed incorrectly based on Cullen's prior installation instructions. Cullen also provided the mortar that was used and oversaw its use and application. (PPAF No. 10).

---

[1] "PPAF" is used herein in referencing Plaintiff's Proposed Additional Facts.

Don Berendsen ("Berendsen") was Cullen's superintendant on the job and randomly held meetings that all workers were required to attend; one such meeting involved a lecture by Berendsen on fire safety and workers were directed to have fire extinguishers available in certain work areas. (PPAF No. 11). Cullen also controlled access to Project site via the gates to the Project site. (PPAF No.12). Cullen controlled safety procedures and required safety training for workers on the Project site. (PPAF No.13). Construction sites can be dangerous and safety was directly implicated in almost all of the plaintiff's and other workers daily activities. (PPAF No. 14).

On the morning of February 28, 2008, plaintiff was informed by Tracy Franklin ("Franklin") and Brandon Hubbard ("Hubbard") that on the previous day (February 27, 2008), Arthur Mahan ("Mahan") (African American) had gotten into a shouting match with them and had threatened them with bodily injury. (PPAF No.15). Both Franklin and Hubbard were UCI employees. (PPAF No. 6).

Plaintiff understood that the reason Mahan threatened Franklin and Hubbard with bodily injury was because Mahan believed the two men were spreading rumors that Mahan was using steroids. (PPAF No.17). On or about February 28, 2008, Plaintiff was accosted by Mahan, an employee of Artega Construction Inc., ("Artega"); this occurred as the plaintiff was coming down the construction lift to take his morning break (approximately 9:15 am.). (PPAF No. 18).

As the plaintiff was coming off the lift (elevator), Mahan was entering the lift, pushing a cart of mortar. (PPAF No. 19). Plaintiff was on his cell phone speaking with his brother, Perry Love. (PPAF No. 19). Upon Mahan spotting the plaintiff, Mahan began shouting at him, accusing him of spreading the rumor that he, Mahan was using steroids. (PPAF No.19). Mahan

3

then came up close to the face of the plaintiff and continued shouting, using profanity, and threatening him with bodily and sexual assault, numerous times. (PPAF No. 20).

Plaintiff responded by shouting back at him, denying his accusations and telling Mahan that that he, plaintiff, didn't tell anyone anything about Mahan. (PPAF No. 21). Plaintiff told Mahan that he, plaintiff, did not want to fight with him; that he, plaintiff, didn't spread any rumors about Mahan, and that plaintiff was not afraid of Mahan. (PPAF No. 21).

Mahan continued his tirade and was grabbed by other workers; Mahan was pulled back and down off the platform. (PPAF No. 22). At the same time plaintiff was being pushed west across the platform by other workers. (PPAF No.22 ). When plaintiff was pushed back, he dropped his cell phone and bent over to pick it up. (PPAF No. 22). Plaintiff was worried it would be stepped on during the commotion. (PPAF No. 23). Plaintiff found the cell phone and put it in his pocket. (PPAF No. 23).

Mahan continued to shout threats at plaintiff from the entry gates while the plaintiff remained on the platform. (PPAF No. 24). Mahan taunted the plaintiff wanting him to come down and fight outside the gates. (PPAF No. 24). Plaintiff refused to leave the platform and stated that he was on the platform and that he was not going to come down and fight. (PPAF No. 24).

Mahan then came up the platform stairs to try and get at the plaintiff again. (PPAF No. 25). Plaintiff's co-workers then grabbed Mahan again and dragged him to the bottom of the platform. (PPAF No. 25). Plaintiff stayed on the platform and Mahan again began shouting his threats of physical and sexual assaults. (PPAF No. 26). Mahan continued to taunt the plaintiff again telling him to come down and fight him outside the gates. (PPAF No. 26). Plaintiff refused to go down and Mahan again went up the stairs to the platform. (PPAF No. 27).

4

Plaintiff's co-workers again dragged Mahan down the stairs. (PPAF No.27 ). Plaintiff stayed on the platform until Mahan left and then went to the UCI lugger[2]. (PPAF No. 27). When the plaintiff got to the lugger, Franklin and Hubbard were there and told the plaintiff that Mahan had told them during the February 27, 2008 incident that "Love is the one I want." (PPAF No. 28). Plaintiff became very concerned and sought out Scott Henninger, and told Henninger what had happened; plaintiff stated that something needed to be done about Mahan's behavior; Henninger agreed. (PPAF No. 29).

When the plaintiff went back to work, Henninger advised him to stay away from Mahan, and to avoid a situation where he may be alone with him. (PPAF No. 30). Plaintiff wasn't satisfied with Henninger's response, so he went to Berendsen's, (J.P. Cullen's Superintendant) office to lodge a complaint against Mahan. (PPAF No. 31). Berendsen was not there so the plaintiff spoke with a man he knew to be Berendsen's assistant, Doug, a red haired white male and another white male (name unknown) and plaintiff told them what had happened. (PPAF No. 32). Plaintiff also pointed out that Mahan had a history of such action and that he, plaintiff, did not feel safe. (PPAF No. 32). Plaintiff stated that that something needed to be done about Mahan's behavior. (PPAF No. 32). Neither of the men took any notes and just listened. (PPAF No. 32). Plaintiff was told that they would follow up with Berendsen. (PPAF No. 32). Plaintiff felt like they were not taking his concerns seriously. (PPAF No. 32).

The next day plaintiff came to work on time and was approached by Henninger; plaintiff was told that there was a meeting scheduled with Berendsen to discuss the incident with Mahan. (PPAF No. 33). Henninger asked the plaintiff to again tell him what happened and the plaintiff told Henninger that he went to Berendsen's office and reported what had happened with Mahan. (PPAF No. 33).

_____

[2] A "lugger" is a type of job trailer on the project site.

Plaintiff and Henninger went to Berendsen's office right away and Berendsen, Henninger, Mahan, plaintiff, and Scott Hastings ("Hastings") (Artega Construction Employee) were all present. (PPAF No. 34). Doug Wagner may have been present as well. (PPAF No. 34). Berendsen asked Mahan for his version of events and then he asked for plaintiff's version of events. (PPAF No. 35). Hastings brought in Javier Garcia ("Garcia") (Artega Employee) who stated that the plaintiff had pulled a knife when Mahan accosted him. (PPAF No. 36). Plaintiff denied that he ever pulled a knife as Garcia was claiming. (PPAF No. 37). During the meeting Berendsen left the meeting and investigated the knife allegation; Berendsen made the determination that no knife was pulled and that plaintiff only had a cell phone in his hand. (PPAF No. 38). Berendsen said he based his conclusion on the statement by Nick (last name unknown) the forklift driver/elevator operator/mortar maker, and others that he spoke with. (PPAF No. 38).

When Berendsen returned from questioning witnesses about the knife allegation; he looked directly at Mahan and he told Mahan "you lied, he [Walter Love] didn't have a knife, he had a cell phone." (PPAF No. 39). Berendsen said that he spoke with several people who verified that plaintiff had a cell phone and not a knife and specifically pointed out that Nick verified this. (PPAF No. 40).

In deciding what should be done, Berendsen first told Mahan that he was "out of here" and then told the plaintiff that he was to have one day off. (PPAF No. 41). Plaintiff took this to mean that Berendsen was giving him a one day suspension. (PPAF No. 41). Hastings then got mad and threatened to call Tony Artega (Artega Construction Owner) because he felt that if Mahan was going to be put off the job then the plaintiff should be removed as well. (PPAF No. 42). Berendsen became angry, pounded the table, used profanity and stated "you both no longer

6

work here any more." (PPAF No. 42). Plaintiff then asked to say something and Berendsen told

him he couldn't. (PPAF No. 43). Plaintiff still went on and pointed out that Berendsen had

listened to several witnesses that Hastings brought forward on Mahan's behalf, but had not let

him call in any witnesses. (PPAF No. 43). Berendsen then said he was not hearing anymore and

told the plaintiff that he no longer worked there and to get off the job site. (PPAF No. 43).

Plaintiff then left with Henninger and they walked to the lugger; Henninger told the

plaintiff to stay in the lugger and wait while he went and spoke with Berendsen. (PPAF No. 44).

Plaintiff waited in the lugger and Henninger went to speak with Berendsen. (PPAF No. 45).

Henninger returned to the lugger after about 30 minutes to an hour and told the plaintiff that

Berendsen would not agree to reinstate him. (PPAF No. 45). Henninger told the plaintiff that

Berendsen said that if the plaintiff was not off the job, the company [meaning UCI] would be

removed from the job. (PPAF No. 46). Henninger also told the plaintiff that Berendsen said if

the plaintiff was not off the job site immediately he, Berendsen, would have the plaintiff

physically removed. (PPAF No. 46). Henninger also told the plaintiff he would try again to

reason with Berendsen. Plaintiff then gathered his tools and left the job site. (PPAF No. 46).

Plaintiff contacted Henninger later in the day and Henninger told him there was no

chance of Berendsen letting the plaintiff back on the job. (PPAF No. 47). Plaintiff was never

allowed back on the job and his employment ended. (PPAF No. 48). Plaintiff did receive a

check for twenty hours of pay in March of 2008, but that was for the last of his previous

February's work. (PPAF No. 48). Plaintiff was a qualified and valuable to worker to UCI and

would have been kept on the Project if Berendsen would have allowed it. (PPAF No. 89.)

7

At no time during the meeting with Berendsen on February 29, 2008, did the allegations of the plaintiff bringing so-called "enforcers" to job site ever come up. (PPAF No. 49). The plaintiff never brought any "enforcers" to the job site and would not do so. (PPAF No. 49).

Plaintiff did have a brief conversation with Douglas Wagner ("Wagner") as he, plaintiff, was leaving the Project site, on February 28, 2008. (PPAF No. 50). Wagner stopped the plaintiff as he was leaving and asked him if he was leaving early. (PPAF No. 51). Plaintiff responded no, that they started early. (PPAF No. 51). Plaintiff then asked Wagner if he had heard about what Mahan had done earlier in the morning. (PPAF No. 51). Wagner stated that he had not and asked what happened. (PPAF No. 51). Plaintiff told Wagner about the threats Mahan had made and that Mahan was acting crazy. (PPAF No.51 ). Plaintiff then noticed his brother and friend coming out of City Hall. (PPAF No.52 ). Plaintiff told Wagner that he had seen his brother and that had to go catch his brother to get a ride. (PPAF No. 52). Plaintiff then told Wagner that "I am like Chuck Woolery, I'm out in 2 and 2." a reference to the famous tagline used by Woolery for commercial breaks, meaning a fast exit. (PPAF No. 52). Plaintiff then left; the conversation was less than 5 minutes long. (PPAF No. 52).

Plaintiff never told Wagner he had any number of men waiting at gates to "get" Art Mahan. (PPAF No. 53). When the plaintiff was outside the gate he saw Henninger and Henninger asked the plaintiff if he was alright. (PPAF No. 53). Plaintiff responded that he was ok. (PPAF No. 53). Plaintiff then introduced Henninger to his brother and plaintiff told Henninger he was getting a ride from his brother. (PPAF No. 53). Henninger then confirmed that the plaintiff was leaving and watched them get in the car and drive away. (PPAF No. 53).

Plaintiff was treated unfairly by Berendsen and Cullen because of his race, African American. (PPAF No. 54). Other Caucasian workers on the Project who were in engaged in

more serious confrontations were treated less harshly then the plaintiff and Mahan. (PPAF No. 55). Prior to February 28, 2008, Joe Mather ("Mather") (Caucasian), J.P. Cullen's scaffold foreman, was engaged in an argument with worker Jason Kluck (Kluck) (Caucasian). (PPAF No. 56). Mather physically pinned Kluck to a chair and Berendsen got between the men to break up the physical confrontation. (PPAF No. 56). Berendsen did not remove either person from the job. (PPAF No. 57).

Following February 28, 2008, Mather again engaged in aggressive physical behavior and slapped Scott Vanlieshout ("Vanlieshout") (Caucasian) in the head, Mather was removed from the Project, and transferred to another job. (PPAF No. 58). Facts show that when two African American males had an argument, where there was no physical contact, they were deemed to be a danger to safety on the Project; when two Caucasian males were engaged in actual physical confrontations, they were not terminated and only after a second altercation was Mather moved to a different Project. (PPAF No. 59). Also, plaintiff was not the aggressor, yet he was removed. (PPAF No. 59). The non-aggressor Caucasian males, Kluck and Vanlieshout were not removed. (PPAF No. 59).

Cullen and Berendsen tolerated a racially hostile environment on the Project, (PPAF No. 60), examples include:

**(1)     Noose Incident.** Cullen and Berendsen tolerated a noose being hung from an upper floor of the Project. (PPAF No. 61). This occurred on approximately November or December of 2007. (PPAF No. 61). It was hung by a Caucasian worker to humiliate an African American worker on the job. (PPAF No. 61). It became a spectacle and was viewed by many of the workers on the Project. (PPAF No. 61). It was talked about on the radio communication system, which was monitored by Berendsen. (PPAF No.61). Though plaintiff complained to

9

Nick (last name unknown), Matt Smith (Cullen employee), Don Berendsen's assistant (Doug, red haired Caucasian male), it remained hanging for about two weeks before being removed. (PPAF No. 61). This was a humiliating, offensive, and racially hostile act that was tolerated by Cullen and Berendsen. (PPAF No. 61).

(2)     **Partner of the Month Award.**  Numerous complaints were made regarding the lack of minority selection and participation in the "Partner of the Month" recognition program. (PPAF No. 62).  Plaintiff was the most vocal regarding the lack of minority representation/selection.  (PPAF No. 62).  Plaintiff directly complained verbally to Berendsen about the situation and it was only well after Plaintiff was off the job, that an African American partner of the month was finally selected.  (PPAF No. 62).  Eligible and qualified African Americans like the Plaintiff were ignored in this program, missing the earned recognition as well as the awards that come with selection.  (PPAF No. 62).  The awards included, monogrammed work clothing, recognition at lunch, and the respect of other workers on the job.  (PPAF No.62). The time period was from when plaintiff started on the job until after he was removed from the job in February 2008. (PPAF No. 62).

(3)     **Journeyman African American Replaced by Caucasian Apprentice.**  On approximately September or October of 2007 Journeyman Operator Bosy Harvey ("Harvey"), African America male, was laid off by Berendsen.  (PPAF No. 63).  Harvey was an experienced operator.  (PPAF No. 63).  He was replaced by an apprentice named Matt Smith (Caucasian male).  (PPAF No. 63).  Also, a Caucasian male who operated a forklift while intoxicated was allowed to remain on the job.  (PPAF No. 63).  Plaintiff made a written complaint to Community Workforce Advisory Committee after he was removed from the job.  (PPAF No. 63).  Plaintiff

also verbally complained to Matt Smith and Nick (last name unknown) about the situation; both were J.P. Cullen employees. (PPAF No. 63).

**(4) Use of the "N" Word on the Project.** Matt Smith, Caucasian male, came to the plaintiff on approximately December 2007 or January 2008 and complained that other Caucasian workers, when in the lunch area, routinely used the "N" word to describe African Americans on the job. (PPAF No. 64). The lunch area was a lugger provided by J.P. Cullen. (PPAF No. 64). Plaintiff understands that Scott Vanlieshout, J.P. Cullen's mason foreman was one of the people who routinely used the epithet. (PPAF No. 64). Plaintiff complained to Scott Vanlieshout about his use of the "N" word. (PPAF No. 64). The complaint was verbal and it was made in that December to January time period. (PPAF No. 64). Lloyd Flowers (African American male) also heard the use of "N" word on the job. (PPAF No. 64).

**(5) Coercion.** After Berendsen removed plaintiff from the job, he went around to other African Americans working on the job with a pre-written letter pressuring them to sign it. In the letter it indicated that J.P. Cullen was a good company that it didn't discriminate against employees and treated employees fairly. (PPAF No. 65). At least two African American employees, Franklin and Hubbard refused to give in to Berendsen's coercion. (PPAF No. 65). This occurred within a month after plaintiff was removed. (PPAF No. 65). This affected most if not all of the African American workers on the job. (PPAF No. 65).

Just prior to being removed from the Project, plaintiff had been asked by Big Step, a firm specializing in recruiting work force participants in urban development to speak about being a minority and working as a foreman in the construction field. (PPAF No. 66). Then, as a result of being removed from the job, plaintiff was unemployed. (PPAF No.66 ). The Laborers Union sent Plaintiff to Berglund Construction for an open position. (PPAF No. 67). Because the

11

Plaintiff had been removed from the City Hall Project (Berglund somehow already knew about his being removed from the City Hall Project), Berglund refused to hire the Plaintiff. (PPAF No. 67).

Plaintiff went back to the Union and complained to Nacarci Feaster ("Feaster") that Berglund would not hire him. (PPAF No. 68). Feaster then went with the Plaintiff to Berglund and insisted that he be hired. (PPAF No. 68). This was a very humiliating experience; plaintiff was an experienced foreman and yet Berglund resisted hiring him. (PPAF No. 69). Berglund was hiring less experienced people and yet resisting hiring the plaintiff, all because of what Berendsen had done to him. (PPAF No. 69). To not be able to support himself was a frightening and humiliating experience for the plaintiff. (PPAF No.70). It was approximately eight weeks before Berglund relented and finally hired him. (PPAF No. 71). During that time Plaintiff experienced anxiety and fear, loss of sleep, and nightmares. (PPAF No. 71). Plaintiff felt black-balled and as if he may never be able to work in his trade again. (PPAF No.72 ). During that time Plaintiff's personal relationships suffered. (PPAF No. 73). He was irritable and anxious; as direct result of Cullen's actions, plaintiff split up with his girlfriend. (PPAF No. 74). Additionally, Plaintiff lacked patience with his son and their father/son relationship became strained. (PPAF No. 74). Plaintiff had never before had to have the union pressure an employer to get hired. (PPAF No. 75). Plaintiff felt inadequate and like a lesser man. (PPAF No. 75). Plaintiff also began experiencing headaches after losing his employment on the City Hall Project. (PPAF No. 75).

After finally being hired at Berglund, plaintiff's anxiety continued. (PPAF No. 7). He was fearful that if he made even the slightest mistake, he could lose his job and not be re-employed. (PPAF No. 76). Plaintiff withdrew and minded his own business; he didn't want to

give offense to anyone or draw attention to myself for fear of being terminated. (PPAF No. 76). Plaintiff withdrew from even his closest friends and family. (PPAF No. 76). In the past, plaintiff was the one that organized and held family events and that all stopped; he felt as though life had closed in on him and he even began to feel claustrophobic in elevators; he still avoids elevators. (PPAF No. 77).

Eventually, plaintiff was laid off by Berglund when the project ended; all the same fears and anxiety intensified for him. (PPAF No. 78). He then worked on and off for several different companies but when the jobs ended, he was released from work, all the while experiencing fear, anxiety, and loss of sleep. (PPAF No .79). He continued to be withdrawn and his personal relationships continued to degrade as his anxiety and fears failed to improve. (PPAF No. 80). Finally, after his employment with Badger Scaffold ended in 2011, he was not able to find work in his trade. (PPAF No. 80).

At this point in his life the humiliation and degradation again intensified; he was not able to find work in his trade. (PPAF No. 81). Plaintiff had to go to friends, hat in hand and borrow money; he had to go to his mother and borrow money. (PPAF No. 82 ). Plaintiff almost lost his home to foreclosure; he could hardly support himself. (PPAF No. 83). The strain was enormous and felt like less than a man and that he was useless and worthless. (PPAF No. 83). Plaintiff couldn't provide for his son and he felt like there was no hope; he was brought to tears; he felt like his son was the only remaining reason to live. (PPAF No. 83).

Plaintiff's life narrowed down to two main things, seeking work and trying to provide for his son, so he could get through high school. (PPAF No. 84). Plaintiff avoided people that he knew because he didn't want people to know that he was still unemployed and having problems supporting himself and his son. (PPAF No. 85). It was degrading and humiliating for the

13

plaintiff that he could not become employed. (PPAF No. 85). Depression, including thoughts of suicide became part of what he lived with. (PPAF No. 86 ). Plaintiff's headaches also continued. (PPAF No. 87). Plaintiff would lie awake at night and at times he would call his mother in Arkansas for emotional support. (PPAF No. 87). At times he was afraid to sleep because of the nightmares. (PPAF No.87 ). His father died in his sleep and at times plaintiff was afraid if he slept, he wouldn't wake up; plaintiff barely hung on. (PPAF No.87 ).

## LEGAL STANDARD

Summary judgment is proper when, viewing all facts and inferences in favor of the non-moving party, no genuine dispute as to material fact exists, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Hudson Ins. Co. v. City of Chi. Heights*, 48 F.3d 234, 237 (7th Cir. 1995). All facts and reasonable inferences must be construed in favor of the non-moving party. *Magin v. Monsanto Co.*, 420 F.3d 679, 686 (7th Cir. 2005). The party seeking summary judgment bears the initial burden of proving there is no material question of fact with respect to an essential element of the non-moving party's case. *MMG Fin. Corp. v. Midwest Amusements Park, LLC,* F.3d 651 (7thCir. Wis. 2011) citing *Delta Consulting Grp., Inc., v. R. Randle Constr., Inc.,* 554 F. 3d 1133, 1137 (7th Cir. 2009). To satisfy this burden, a party is only entitled to rely on admissible evidence. *Bielskis v. Louisville Ladder, Inc.,* 663 F.3d 887,898 (7th Cir. 2010). To defeat a motion for summary judgment, an opposing party need only demonstrate a dispute of material facts. *Matsushita Elec. Indus. v. Zenith Radio Corp.,* 475 U. S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). Summary judgment should not be granted unless it is "abundantly clear that no material issue of fact exists." *Chambers v. American Trans. Air,* 17 F.3d 998, 1002 (7th Cir. 1994*).* As ***"summary judgment is such an extreme remedy, it should not be granted unless the nonmoving party cannot prevail under***

*any discernable circumstances."* *Bonds v. Coca-Cola Co.,* 806 F.3d 1324,1331 (7th Cir. 1986) (emphasis my own).

## ARGUMENT

Defendant is not entitled to summary judgment as a matter of law. Though not plaintiff's direct employer, it maintained control over plaintiff's employment to such an extent that it had plaintiff removed from his job and for the protections of Title VII was a de facto or indirect employer of the plaintiff.

### I. FOR TITLE VII LIABILITY DEFENDANT WAS A DE FACTO OR INDIRECT EMPLOYER OF THE PLAINTIFF

Though not always the case[3], generally a plaintiff must establish an employment relationship with a defendant to be afforded the protections of Title VII. It is equally true that just what constitutes an employment relationship is broader than the traditional notion of employee and employer.

For the purposes of Title VII protections, it is well established that an employee may have multiple employers. *Tamayo v. Blagojevich,* 526 F.3d 1074, 1088 (7th Cir. 2008) ("[A]ny of the Affiliates that possibly maintained an employment relationship with [the plaintiff] may be named as a defendant under Title VII." (quoting *Worth v. Tyer,* 276 F.3d 249, 259 (7th Cir. 2001))). "Multiple entities may be considered an employees 'employer' for the purposes of Title VII liability." *Tamayo* at 1088 (quoting *Worth* at 259).

An employer may be considered a "de facto" or "indirect employer" if it "directed the discriminatory act, practice, or policy of which the employee is complaining." *Tamayo* at 1088 (quoting *Papa v. Katy Indus., Inc.,* 166 F.3d 937, 941 (7th Cir. 1999)). A company that exerts

---

[3] In cases of retaliation brought under Title VII, it has been firmly established that post employment actions where no employment relationship exists, provide protections to plaintiffs. See *Verpinsky v. Fluor Daniel* 87 F.3d 881 (7th Cir. 1996).

control over a plaintiff's existing employment relationship may be considered a de facto or indirect employer for the protections of Title VII. *EEOC v. Illinois,* 69 F.3d 167, 169 (7th Cir. 1995). See also *Tamayo* at 1088. "De facto or indirect employer liability depends on the amount of control a putative Title VII defendant exerts over the plaintiffs employment." *Kerr v. WGN Cont'l Broad. Co.*, 229 F. Supp. 2d 880, 886 (N.D. Ill 2002) (citing EEOC 69 F.3d at 171-172). "… courts must look to the 'economic realities' of the employment relationship, as well as the 'degree of control the employer exercises," to determine whether an entity may be considered an employer for the purposes of Title VII liability." *Tamayo* citing *Heinemeier v. Chemetco, Inc.,* 246 F.3d 1078, 1082-1083 (7th Cir. 2001). See also *Little v. Ill. Dep't of Revenue,* 369 F.3d 1007, 1008-09 (7th Cir. 2004) (noting that employee who worked for the IGB was, for the purposes of Title VII, also an employee of IDOR).

1.     **The "Five Factor Test" is the Wrong Legal Standard.**

Defendant argues that the five factor test set forth in *Ost* and *Knight* is the proper standard by which to evaluate the whether defendant was plaintiff's indirect or de facto employer. (*defendant's brief,* ECF 22, p. 7) (citing *Ost v. Suburban Travelers Limousine, Inc.,* 88 F.3d 435, 438 (7th Cir. 1996) (citing *Knight v. United Farm Bureau Mut. Ins. Co.,* 950 F.2d 377, 378-379 (7th Cir. 1991).

The five factor test is the test to be used when assessing the employment relationship of an <u>independent contractor</u>. The distinction is both important and easily overlooked. The *Kerr* Court in its recitation of the development of the law in this area clarifies the matter:

> In Alexander v. Rush North Shore Med. Ctr[4]., the Seventh Circuit recognized that *Doe* was irreconcilable with Ost and Knight. See *Alexander,* 101 F.3d 487, 488 (7th Cir. 1996). Each of these cases involved a Title VII plaintiff asserting a claim against an entity with which the plaintiff did not have a direct employment

---

[4] *Alexander v. Rush North Shore Med. Ctr.,* 101 F.3d 487 (7th Cir. 1996) <u>followed</u> both *Ost and Knight.*

> relationship. All of the plaintiffs were independent contractors, and thus <u>did not have a direct employment relationship with any Title VII employer</u>. Doe permitted such a suit to proceed, while Ost and Knight did not. <u>Alexander over-ruled Doe, and held that a plaintiff must have a traditional employment relationship with some entity in order to maintain a Title VII action.</u> See *Alexander* 101 F.3d at 491-93. (emphasis my own)

*Kerr v. WGNCont'l Broad. Co.,* 229 F. Supp. 2d 880, 885 (N.D. Ill. 2002).

The *Ost* case was a true independent contractor case. Plaintiff owned Ost Limousine, Ltd., and was the primary driver of the limousine owned by that corporation. *Ost v. Suburban Travelers Limousine, Inc.,* 88 F.3d 435, 436 (7th Cir. 1996). Ost Limousine contracted with West Suburban to provide it with dispatching services. *Id.* West Suburban was an airport limousine dispatch service. *Id.* It did not maintain its own fleet of limousines; rather, it contracted with individuals, such as Ost, to provide the vehicles that it dispatches. *Id.* Under the arrangement with West Suburban, Ost made her limousine available for dispatch. *Id.* Plaintiff was responsible for all of the fees associated with owning and maintaining her vehicle. *Id.*

The distinction is clear, in *Ost*, the plaintiff was an independent contractor, meaning, as the *Kerr* court points out, that she had no other direct Title VII employer. As this relates to the current case, plaintiff does have a direct Title VII employer, Union Contracting, a subsidiary of EMI. (PPAF No. 4). If it were Union Contracting or EMI alleging discrimination by the defendant, then the five factor test might apply, however, because plaintiff was employed by Union Contracting, Inc., the five factor test is not the proper legal standard.

The correct legal standard to be applied in cases of de facto or indirect employment where the plaintiff is not an independent contractor is a broader and more encompassing standard which requires an evaluation of the extent of control exerted by the alleged de facto or indirect employer (*EEOC v. State of Ill.,* 69 F.3d at 171-72*)* <u>and</u> the "economic realities" of the

17

employment relationship.  *Tamayo* citing *Heinemeier v. Chemetco, Inc.,* 246 F.3d 1078, 1082-1083 (7th Cir. 2001).  See also *Little v. Ill. Dep't of Revenue,* 369 F.3d 1007, 1008-09 (7th Cir. 2004) (noting that employee who worked for the IGB was, for the purposes of Title VII, also an employee of IDOR).

It is undisputed that plaintiff was directly employed by Union Contracting, Inc., and was therefore not an independent contractor.  (PPAF No. 4) (DPMF No. 10)[5].  Defendant admits that it controlled plaintiff's employment in powerful and significant ways.  (DPMF No.'s 3, 9)

Defendant admits that it was an indirect or de facto employer.  Its proposed material facts number 9 specifically states that

> J.P. Cullen did retain the right to remove an employee from the job site, if necessary to preserve the safety, productivity and well being of other workers on the Project.  Don Berendsen, J.P. Cullen's superintendent on the Project had the responsibility to and authority to investigate such incidents and to make such determinations.

(DPMF No. 9).

Typically, the way employment works for union laborers, is that a union member seeks to obtain employment with a contractor or subcontractor; the goal is to get hired by a quality contractor or subcontractor and then as one project is completed be moved to the next project and so on.  (PPAF No. 7)   Working for a good general or sub directly correlates to on-going employment. (PPAF No. 7)   In the instant case, the plaintiff was hired by Union Contracting for the purpose of working on the Milwaukee City Hall Project.  (PPAF No.4 )   Union Contracting recognized plaintiff as a skilled and valuable employee, giving him foreman pay and duties.  (PPAF No.'s 4, 89)

The City Hall renovation project was a multiyear large scale project.  (PPAF No. 3) Workers often worked several stories above street level.  (PPAF No. 5)  As with all construction

---

[5] "DPMF" refers to defendant's proposed material facts (ECF 23, p. 1-3)

sites safety is directly implicated in almost all a worker's daily activities.  (PPAF No.14 )

Defendant as the general contractor for the Project exercised significant control over its own

direct employees, subcontractor employees, and subcontractor's subcontracted employees.

(PPAF No.'s 10, 11, 12. 13) (DPMF No. 9).  In plaintiff's case, Union Contracting, a

subcontractor and subsidiary of EMI, was significantly controlled in the following ways:

Wages and benefits were dictated by the defendant; Article 10.1 of the contractor

subcontractor agreement between EMI and defendant specifically provides:

> Contractor [defendant] is signatory to collective bargain
> agreements with the following unions:  carpenters, cement
> finishers, ironworkers, laborers, masons, operating engineers, and
> truck drivers.  The collective bargaining agreements contain
> subcontracting clauses that prevent the Contractor from
> subcontracting work covered by the collective bargaining
> agreements to "non-union" subcontractors.
>
> For types of work covered by Contractor's collective bargaining
> agreements, Subcontractor shall perform work at the Project site
> with workers covered by the appropriate collective bargaining
> agreement.[6]

Union contracts set out wage, hour, and benefit terms for signatory employers like, Union

Contracting, plaintiff's direct employer.  Under the terms of the contractor/subcontractor

agreement, defendant has reached out and set minimum wage, hour, and benefit requirements for

not only the subcontractors employees, but also the subcontractor's subcontractor's employees

by requiring all of the subcontractors workforce, even it's subcontractors, to be signatory to

union contracts covered in Article 10.1.  (PPAF No. 90) (DPMF No. 4).  Considered in terms of

both the control being exerted by the defendant and the economic realities of the

contactor/subcontractor contract, defendant has in fact controlled and dictated wage, hours, and

benefit standards, as well as requiring union membership for all of the EMI's employees and

---

[6] Defendant apparently found this provision to be so significant that it was underlined in the original contract.

subcontracted employees that fall within the identified trades of Article 10.1. (PPAF No. 90). In doing so, Defendant maintained massive control over plaintiff's working conditions, including on-going union membership, wages, hours, benefits, and safety. (PPAF No. 90) (DPMF No. 4).

Defendant also admits reserving for itself the right to remove employees from the Project for reasons of safety. (DPMF No. 9). Given the size, location, and type of work entailed in the Project, safety concerns permeate all aspects of worker's daily life on the Project. (PPAF No. 14). By maintaining the right to remove any worker for safety concerns, defendant has again reached down past its direct employees, past its subcontractor's employees, and all the way the subcontractor of a subcontractor's employees and reserved the right to significantly and in the instant case discriminatorily impact the lives of workers on the project. In the context of the economic realities and control being exerted by the defendant, the ability to remove a worker, without any due process rights or fair hearing, constitutes significant control over the terms and conditions of plaintiff's employment. The coercive nature and imbalance of power held by the defendant was succinctly and decisively carried out when Don Berendsen threatened to remove Union Contracting from the job if it didn't immediately have plaintiff leave the job site. (PPAF No. 46). Even more to the point, defendant exerted such control over the plaintiff, that it did not hesitate to threaten to have the plaintiff physically removed for the Project while plaintiff was merely trying to plead his case. (PPAF No. 46).

In terms of the employment context, what can be more basic than controlling a worker's wage, union affiliation, hours of work, working conditions, and ability to access the job site? Despite all this control, defendant maintains the fiction that it was not plaintiff's de facto or indirect employment. Such claims by the defendant are self-serving and pure flummery.

20

Defendant unconvincingly argues that it did not terminate the plaintiff and that it did not have the power to do so (*Plaintiff's Brief*, ECF 22, p. 8), however, in the context of the instant case, defendant removed the plaintiff from the Project when he had been hired to specifically work on the Project. (DPMF No. 12) (PPAF No. 43). The proffered reasons for the removal were unproven and untrue, yet cast the plaintiff as a dangerous individual resulting in his loss of his employment. (PPAF No.'s 36, 37, 38, 39, 40, 41 42, 43, 47, 53, 88, 89). But for the discriminatory acts of the defendant in its role of de facto or indirect employer, plaintiff would have continued in his employment with Union Contracting. (PPAF No. 13).

II. **PLAINTIFF IS ENTITLED TO BACK PAY AND THE BACK PAY PERIOD SHOULD NOT BE RESTRICTED TO THE TIME DEFENDANT ENDED PLAINTIFF'S EMPLOYMENT TO THE TIME PLAINTIFF BEGAN WORKING FOR BERGLUND.**

The purpose of Title VII is to make persons whole for injuries that result from unlawful employment discrimination. *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 418, 45 L. Ed. 2d 280, 95 S. Ct. 2362 (1974). In the absence of special factors, backpay should be awarded when a Title VII violation is found. *Stewart v. General Motors Corp.,* 542 F.2d 445, 451 (7th Cir. 1976), *cert. denied* 433 U.S. 919, 53 L. Ed. 2d 1105, 97 S. Ct. 2995 (1977). Courts may award the <u>equitable</u> remedy of back pay when there has been a finding that the defendant "intentionally engaged in" an unlawful employment practice. *See 42 U.S.C. § 2000e-5(g)(1)*; *EEOC v. IIona of Hungary, Inc.,* 108 F.3d 1569, 1579 (7th Cir. 1997*)* ("The district court has broad equitable discretion to fashion back pay awards to make the Title VII victim whole."). Absent special circumstances, a court should award back pay when there has been a finding of a Title VII violation. *EEOC v. Accurate Mechanical Contractors, Inc., 863 F. Supp. 828, 835 (E.D. Wis. 1994).* In the context of Title VII, "a plaintiff is eligible for back pay from the date of her injury

21

to the date that she acquires a higher-paying job." *Gaffney v. Riverboat Servs.,* 451 F.3d 424, 463 (7th Cir. 2006) (citing *Matthews v. A-1, Inc.,* 748 F.2d 975, 978-79 (5th Cir. 1984)).

After Defendant removed plaintiff from the Project, with union assistance, plaintiff began work with Berglund. (PPAF No.s 67, 68, 69). Plaintiff worked at Berglund in a lesser position and for less money. (PPAF No. 71). Defendant mistakenly argues that "At Berglund, Plaintiff earned the same or higher union wages he had earned working on the Project for Union [Contracting]. Hence, if Plaintiff is entitled to any back-pay award it is for the period of time he became unemployed between the end of his work at Union and the beginning of his work at Berglund, approximately one month, reduced by any unemployment compensation received during that time period." *(Plaintiff's Brief,* ECF 22, p. 9) (PPAF No. 71).

This analysis is faulty. Defendant asserts[7] that plaintiff earned the same or more at Berglund, without comparing the actual loss experienced by the plaintiff to the new employment. Plaintiff's expert economist, Dr. Stan Smith Ph.D. calculated plaintiff's loses in his expert report and determined that the lost wages to the plaintiff for year 2008, were $4,258.00 and have continued, despite mitigation by the plaintiff, to a projected cumulated loss of $124,940.00. (PPAF No. 91). The fact that the plaintiff mitigated his losses by taking a lower paying positions does not relieve the defendant of it obligation to make the plaintiff whole, nor does it end the accrual of plaintiff's on-going losses; only upon the defendant being hired at a comparable wage or greater will defendant's liability end. *Gaffney* at 463.

### III. PLAINTIFF IS ENTITLED TO CLAIM BACK PAY PAST THE DATE OF PROJECT COMPLETION.

---

[7] Defendant does not cite to any evidence in support of this contention.

Defendant argues that even if plaintiff's back pay claim period extends past his employment with Berglund that it must be cut off at the point in time which the Project would have ended[8]. (P*laintiff's Brief,* ECF 22, p. 9). In support of this position, defendant relies on the Court's decision in *Gaddy v. Abex Corp.*, 884 F.2d 312 (7th Cir. Ill. 1989). In *Gaddy,* the plaintiff alleged that because she was a women she received less overtime hours. *Gaddy* at 316. Plaintiff prevailed and was awarded back pay. *Id* at 316. On appeal, the Court determined that the back pay calculation should have taken into account scheduled plant closings when plaintiff would have been off of work for non-discriminatory reasons; the case was remanded for the determination of the correct period of time. *Id* at 319-20.

*Gaddy* is distinguishable from the case at hand. In current case though plaintiff's work at the Project would eventually have ended, that does not mean that plaintiff's direct employment with Union Contracting would have ended; in fact, the opposite is true, plaintiff expected on-going employment and he would have simply begun work on Union's next project following the Milwaukee City Hall Project. (PPAF No. 6). Defendant cites to no evidence that the end of the Project would have resulted in the end of plaintiff's direct employment with Union Contracting.

IV. **PLAINTIFF IS ENTITLED TO COMPENSATORY DAMAGES INCLUDING PUNITIVE DAMAGES AND DAMAGES FOR PAIN, SUFFERING, LOSS OF ENJOYMENT OF LIFE, AND EMOTIONAL DISTRESS.**

1. **Plaintiff's Claim for Punitive Damages**

Punitive damages are available to the plaintiff if it can demonstrate that the defendant engaged in intentional discrimination "with malice or with reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. § 1981a(b)(1). In *Kolstad v. American*

---

[8] Defendant is inconsistent regarding the ending date of the Project; Berendsen Affidavit ECF 25, ¶ 1 identifies the end of the Project being in January 2009, while CFO Wisnefsky's Affidavit ECF 24, ¶ 2 puts the project end date as December 2008. Defendant's brief ECF 22, p. 9 and proposed material facts ECF 23, No. 1 utilizes the December 2008 end date.

*Dental Ass'n*, the Supreme Court established a three-part framework to determine whether punitive damages are proper under § 1981a. 527 U.S. 526, 533-46, 119 S. Ct. 2118, 144 L. Ed. 2d 494 (1999). First, the plaintiff must show that the employer acted with "malice" or "reckless indifference" toward the employee's rights under federal law. *Id.* at 533-539. A plaintiff "may satisfy this element by demonstrating that the relevant individuals knew of or were familiar with the anti-discrimination laws" but nonetheless ignored them or lied about their discriminatory activities. *Bruso v. United Airlines, Inc.,* 229 F.3d 848, 857-58 (7th Cir. 2001). The plaintiff has the burden of proving "malice" or "reckless indifference" by a preponderance of the evidence. *See generally Price Waterhouse v. Hopkins*, 490 U.S. 228, 253, 109 S. Ct. 1775, 104 L. Ed. 2d 268 (1989). Second, the plaintiff must establish a basis for imputing liability to the employer based on agency principles. *Kolstad*, 527 U.S. at 539-44. Employers can be liable for the acts of their agents when the employer authorizes or ratifies a discriminatory act, the employer recklessly employs an unfit agent, or the agent commits a discriminatory act while "employed in a managerial capacity and . . . acting in the scope of employment." *Id.* at 542-43 (quoting Restatement (Second) of Agency No. 12-1017 § 217C (1957)). Third, when a plaintiff imputes liability to the employer through an agent working in a "managerial capacity . . . in the scope of employment," the employer has the opportunity to avoid liability for punitive damages by showing that it engaged in good-faith efforts to implement an anti-discrimination policy. *Id.* at 544-46. This is a fact-intensive analysis, and "although the implementation of a written or formal anti-discrimination policy is relevant to evaluating an employer's good faith efforts . . . , it is not sufficient in and of itself to insulate an employer from a punitive damages award." *Bruso*, 239 F.3d at 858.

With respect to the first element of the *Kolstad* framework, plaintiff must show that the defendant acted with "malice" or "reckless indifference" *Kolstad* at 533-539. Plaintiff can meet this burden by showing that the relevant persons knew of or were familiar with anti discrimination laws. *Bruso* at 857-58. Superintendent Berendsen was aware of the anti-discrimination laws and the seriousness of those laws. (PPAF No. 92). He in fact in his affidavit supporting defendant's motion for summary judgment, admits that a "worker's participation in racially discriminatory actions could cause the worker to be removed from the Project job site." (PPAF No. 92). Further, evidence of prior events of racially harassing behavior, such as the hanging of a noose on the project site were tolerated by Berendsen. ( PPAF No.s 61-65).

Applying the second element to the current case, plaintiff must establish a basis for imputing liability to the defendant. Again, the element is easily satisfied through defendant's own affidavits in support of summary judgment. The rule is that employers can be liable for the acts of their agents when the employer authorizes or ratifies a discriminatory act, the employer recklessly employs an unfit agent, or the agent commits a discriminatory act while "employed in a managerial capacity and . . . acting in the scope of employment." *Kolstad*. at 542-43 (quoting Restatement (Second) of Agency No. 12-1017 § 217C (1957)). In the current matter, Superintendent Berendsen in his affidavit admits that he conducted an investigation, asked for statements, interviewed witnesses, wrote out a statement for a witness, determined witness credibility, and controlled a meeting of the parties. (PPAF No. 93). He then removed two African American male workers from the job based upon what he concluded were safety concerns. (PPAF No. 94). He admits the authority to remove a worker from the job based upon his unilateral decision making power as vested in him by the defendant. (PPAF No. 94). Berendsen apparently views two angry black men as a lager safety threat than Caucasian men

who come to physical blows.  There is no doubt that defendant, by vesting such broad and plenary powers in Superintendant Berendsen is liable for his discriminatory conduct.  It is also worth noting that the management of the defendant company has continually stood behind and ratified Superintendant Berendsen's actions as demonstrated when it ignored the recommendations of the Community Workforce Advisory Committee that the defendant cure its discriminatory acts and among its recommendations, to reinstate the plaintiff.  (PPAF No. 95).

The third and final element allows that the defendant be allowed to avoid punitive damages through a good faith showing of its efforts to implement an anti-discrimination policy. *Kolstad* 544-46.  Thus far, defendant, other than through assertions that it does not tolerate discrimination, has failed to offer any credible evidence that it made good faith efforts to eliminate discrimination on the Project.  Plaintiff on the other hand has produced credible evidence of defendant's willingness to tolerate discrimination on the Project.  (PPAF No.s 61-65) Examples include, the noose incidents, tolerating the use of racial epithet referred to as the "N" word, and ignoring the valid concerns of an outside independent third-party group (Community Workforce Advisory Committee). (PPAF No.s 61-65, 95).  Defendant has demonstrated nothing more than lip service to maintaining an anti-discrimination policy on the Project.  In the end, the described efforts of the defendant are not sufficient to insulate the defendant from a punitive damage award.  *Bruso*, at 858.

### 2.    Plaintiff's Damages for Pain, Suffering, and Emotional Distress.

Victims of intentional discrimination prohibited by Title VII may recover compensatory damages for "...emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses." *42 U.S.C. § 1981a(b)(3)*.  The plaintiff's affidavit testimony of the emotional distress, pain, and suffering is sufficient to support such an award.

*EEOC v. HCS Med. Staffing, Inc*., 2011 U.S. Dist. LEXIS 136533 (E.D. Wis. Nov. 28, 2011) (citing *Denius v. Dunlap,* 330 F.3d 919, 929 (7th Cir. 2003) (holding that a plaintiff's affidavit testimony may suffice as the sole evidence of emotional distress if she can explain her injury in "reasonable detail" or if the facts underlying the case are so inherently degrading that a person would suffer emotional distress from the defendant's actions)).

Directly at hand plaintiff has identified the following as a result of being removed from the job. He was unemployed and the Laborers Union sent him to Berglund Construction for an open position. (PPAF No.s 66, 67). Because he had been removed from the City Hall Project (Berglund somehow already knew about this), Berglund refused to hire him. (PPAF No. 67)

Plaintiff went back to the Union and complained to Nacarci Feaster that Berglund would not hire him. (PPAF No. 68). Nacarci then went with the plaintiff to Berglund and insisted that the plaintiff be hired. (PPAF No. 68). This was a very humiliating experience for the plaintiff; he was an experienced foreman and yet Berglund resisted hiring him. (PPAF No.69). Berglund was hiring less experienced people and yet resisting hiring him, all because of what Berendsen and Cullen had done. (PPAF No. 69). Plaintiff found not being able support himself to be a frightening and humiliating experience. (PPAF No.70 ). It was approximately eight weeks before Berglund relented and finally hired him. (PPAF No.71). During that time plaintiff experienced anxiety and fear, loss of sleep, and nightmares. (PPAF No.71). Plaintiff felt black-balled and as if he may never be able to work in his trade again. (PPAF No. 72). During that time plaintiff's personal relationships suffered. (PPAF No. 73). He was irritable and anxious and split up with his girlfriend. (PPAF No. 74). Additionally, he lacked patience with his son thereby straining the father/son relationship. (PPAF No.74). Plaintiff had never before had to have the union pressure an employer to get hired. (PPAF No. 75). Plaintiff states that he felt

27

inadequate and like a lesser man and that he also began experiencing headaches after losing his employment on the City Hall Project. (PPAF No. 75).

After finally being hired at Berglund, the anxiety continued for the plaintiff; he was fearful that if he made even the slightest mistake, he could lose his job and not be re-employed. (PPAF No. 76). The plaintiff withdrew, minding his own business; he didn't want to give offense to anyone or draw attention to himself for fear of being terminated. (PPAF No. 76). This spilled over into his private life as he withdrew from even his closest friends and family; wherein the past, plaintiff was the one that organized and held family events, that all stopped for him. (PPAF No. 77). He states that it felt as though life had closed in on him and he even began to feel claustrophobic in elevators; he still avoids elevators. (PPAF No. 77).

Eventually, plaintiff was laid off by Berglund when the Project ended, and all the same fears and anxiety intensified. (PPAF No.78). Following his stint at Berglund, he then worked for several different companies but when the jobs ended, he was released from work, all the while still experiencing fear, anxiety, and loss of sleep. (PPAF No.79). Plaintiff continued to be withdrawn and his personal relationships continued to degrade as his anxiety and fears failed to improve; finally, after plaintiff's employment with Badger Scaffold ended in 2011, he was not able to find work in his trade. (PPAF No.80).

Plaintiff states that by that point the humiliation and degradation intensified even more and he was not able to find work in his trade. (PPAF No. 81). Plaintiff had to go to friends, hat in hand and borrow money; he also had to go to mother and borrow money. (PPAF No. 82). Plaintiff almost lost his home to foreclosure and he could hardly support himself any more. (PPAF No. 82). The strain was enormous for the plaintiff and he felt less than a man; he felt he was useless and worthless. (PPAF No. 83). Because he could hardly provide for his son

plaintiff felt like there was no hope; that he was brought to tears; and that he felt like his son was the only remaining reason to live. (PPAF No.83)

Plaintiff's life narrowed down to two main things, seeking work and trying to provide for his son so he could get him through high school. (PPAF No. 84). Plaintiff avoided people that he knew because he didn't want people to know that he was still unemployed and having problems supporting himself and his son. (PPAF No.85). Plaintiff experienced depression; identifying how thoughts of suicide became part of what he lived with. (PPAF No. 86). Plaintiff's headaches continued and he would lie awake at night and at times would call his mother in Arkansas for emotional support. (PPAF No.87). At times plaintiff was afraid to sleep because of his nightmares; his father died in his sleep and at times he was afraid that if he slept, he wouldn't wake up. (PPAF No. 87). Plaintiff has barely hung on. (PPAF No. 87).

Plaintiff's expert has also valued the economic loss to the plaintiff for the compensatory damages and loss of enjoyment of life. (PPAF No. 91). Plaintiff has experience significant and long term emotional distress, humiliation, degradation, loss of enjoyment of life, and mental anguish and suffering as a result of the actions of the defendant and is entitled to recover those damages.

## CONCLUSION

For the reasons set forth herein, Plaintiff, Walter V. Love, respectfully requests that the extreme remedy of summary judgment not be granted to the defendant on any of its claimed issues, and that defendant's motion for summary judgment be dismissed in its entirety and with prejudice.

Dated:  July 19, 2013                     MIDWEST LEGAL CENTER, LLC
                                          Counsel to Plaintiff Walter Love


                                          By: s/ Larry R. Coté, Jr.
                                              Larry R. Coté, Jr., SB# 1022228
                                              W175N11163 Stonewood Dr., Suite 104
                                              Germantown, WI 53022
                                              (p) 262-251-8405; (f) 262-251-84031